## O'LEARY v. MULDOON.

(Supreme Court, Appellate Division, Second Department. December 14, 1900.)

MASTER AND SERVANT—NEGLIGENCE OF SERVANT—INJURY TO THIRD PERSON—
EMPLOYMENT OF SERVANT—SUFFICIENCY OF EVIDENCE.

Plaintiff was injured by a truck and team, caused by the negligence of the driver, who was alleged to have been in the employment of defendant, who sought to show that the horses were owned by one S., and that the particular work from which the injury resulted was being done by S. The driver had worked much of the time for a year preceding the acci-

dent for the defendant, and he told a policeman after the accident that he was driving the team for defendant. The driver and S. testified that the former was employed by S., but their testimony was conflicting. The defendant was receiving $4.25 a day for each team employed in doing the work in question, and he testified that he was paying S. $5 per day for the driver and team, and was furnishing the truck. S. was a peddler, and had no use for a driver, except for the particular work which was being performed in carrying out a contract made by the defendant. *Held* sufficient to sustain a finding that the driver was in the employ of the defendant.

Goodrich, P. J., dissenting.

Appeal from trial term, Kings county.

Action by William O'Leary against John Muldoon for injuries received through the negligence of defendant's servant. From a judgment in favor of plaintiff, and from an order denying a motion for a new trial, defendant appeals. Affirmed.

Argued before GOODRICH, P. J., and BARTLETT, WOODWARD, HIRSCHBERG, and JENKS, JJ.

George V. Brower, for appellant.

Joseph A. Flannery, for respondent.

HIRSCHBERG, J. The plaintiff, while working on West street, in the borough of Manhattan, was severely injured by a truck and team in charge of a driver named Kraus, who is alleged to have been in the defendant's employment at the time. It is undisputed that the truck belonged to the defendant, and that it was engaged at the time of the accident in transporting material from the factory of the Johns Asbestos Company, on Thirty-Ninth street, Brooklyn, to a ship at the foot of Thirty-Second street, Manhattan, pursuant to a general contract for such trucking made by the company with the defendant. The accident occurred on Friday, February 17, 1899, during a blizzard of snow, which commenced falling on the previous Monday; and the defense sought to be established was that the horses belonged to one Teriansky (called Samuels), who, because of the storm, was aiding the defendant, and who was doing this particular trucking with a driver in his own employ. Assuming that Kraus was in the general employ of Samuels, the evidence leaves it doubtful whether Samuels really did the trucking under an independent contract with the defendant, or whether the defendant hired both the horses and driver in order to have the trucking done by himself, and with the right to have it done under his own direction and control. In the latter case the authorities are to the effect that the defendant could be held responsible, under certain circumstances, for the negligence of Kraus, although he was not in his general employment. Wood, Mast. & S. 3281; Cunningham v. Improvement Co., 20 App. Div. 171, 46 N. Y. Supp. 954; Wyllie v. Palmer, 137 N. Y. 248, 33 N. E. 381; McInerney v. Canal Co., 151 N. Y. 411, 45 N. E. 848; Higgins v. Telegraph Co., 156 N. Y. 75, 50 N. E. 500. The case, however, was not submitted to the jury upon the theory of a servant in the general employ of one person, but temporarily transferred to the use and control of another, but was submitted to the jury to decide whether, as matter of fact, Kraus was at the time in the actual employment of the defendant. The

plaintiff requested a charge to the effect that if the driver and team were hired together by Samuels, but the defendant took the direction of them in his own work, and on an undertaking of his own, the driver then became an employé of the defendant, but this was refused. The defendant presented no requests, and took no exceptions to the charge. The disposition of the case was distinctly in defendant's favor, as it permitted no recovery if the jury believed that Samuels hired Kraus, no matter what the conditions might be under which his services were transferred to the defendant. As the only exception taken was to the refusal to nonsuit, the only question to be determined on appeal is whether the evidence justified the conclusion reached by the jury, that Kraus was really hired by the defendant. The evidence on the part of the defendant relating to this question was given by interested witnesses, whose credibility was a proper question for the jury's consideration. The testimony was contradictory and conflicting, and, after a careful analysis of it, I am satisfied that the statement that Kraus was hired by Samuels was a mere pretense suggested to relieve the defendant from the consequences of the accident. Kraus was frequently in the defendant's direct employ. He testified as follows:

"Q. How long have you been working, on and off, for Muldoon? A. About a year on and a year off, a day on and a day off, a week on and a week off."

On further inquiry he testified:

"Q. Didn't you work for Mr. Muldoon pretty steadily before the day of the accident? A. A day off and a day on. Q. But it was constantly, wasn't it? A. Not constantly. Q. Wasn't it frequently? A. I would stand on the corner, and if he wanted me he would come down and tell me to go up and go to work."

After the accident he was arrested, and he testified in relation to what he told the policeman as follows:

"Q. Did you not tell the policeman when he arrested you that you were working for Mr. Muldoon? A. Me? Q. Yes. A. No, sir; I did not. Q. Didn't you tell him anything about who you were working for? A. No, sir. Q. Weren't you asked who you worked for? A. Yes, sir. Q. Did you answer that question? A. Yes, sir. Q. You did answer that question when you were asked by the policeman, did you? A. No, sir; I did not answer it. Q. Why did you just say, now, you did answer the question when the policeman asked you? A. Answer what question? Q. The question as to who you were working for. A. That I was told he was working for Mr. Muldoon? Q. No; weren't you asked by the policeman whom you were working for, when you were arrested? A. Yes, sir. Q. Did you tell him? A. Yes, sir; I told him. Q. Who did you tell him you were working for? A. I told him, by Mr. Muldoon,—hired out by Mr. Muldoon."

His testimony on the question of how much work he did in trucking for the defendant that week is not clear, and appears to be contradicted by Samuels. He testified:

"Q. Who did you work for on the 16th of February, 1899, the day before? A. Mr. Samuels. Q. Who did you work for on the 13th? A. Mr. Samuels."

Samuels testified on the subject in the following ways:

"Q. How many days had he [Kraus] been working previous to the 17th,— Friday, the 17th? A. The accident happened on Friday, and he was working for me, beginning Monday, continuously to the day of the accident."

Again he testified:

"Q. Didn't you hire out the team and the harness to Muldoon, during the week of the big storm, day by day? A. That was the only week that I hired out to him,—that they worked with my horses continually for a week, beginning Monday and ending Friday. Q. You hired your horses out continually during that week to Muldoon? A. Yes; from Monday to Friday. Q. And the only day you hired Kraus out as driver was the day the man was hurt? (Objected to as improper. Objection sustained.) Q. Isn't it true that the only time you hired Kraus out as driver during the week of the storm was the day the man was hurt? A. Yes, sir."

This statement that Kraus was working for Samuels as his hired man during the days of that week immediately preceding the accident, and was only hired out to the defendant on the day of the accident, was then emphasized by Samuels as follows:

"Q. Don't you know whether or not Kraus was working for you on the days prior to the accident? A. Well, he worked for me, as I stated before, a couple of days, a week before the accident, and then he worked for me that week, beginning Monday and ending Friday. Q. Where did he work for you? A. That week he worked for me in New York. He was working at the snow."

And finally he swore like this:

"The Court: Did you on any of those days hire your team to Muldoon without a driver? The witness: No; with the driver. Recross-examination by Mr. Flannery: Q. Didn't you say a few moments ago that the only day on which you hired the team and driver out together to Muldoon was on the Friday, the day the man was hurt? A. No; I did not say that. Q. Didn't you say that while the team was hired out to Muldoon on the other days of the week before the day the accident happened that the man was working,—that the driver was working for you in New York? A. No; not for me."

On the important question of who gave the directions for the work on the day of the accident, the evidence is equally conflicting. Samuels said nothing on the subject. Kraus said:

"Q. And Mr. Muldoon told you then to go up to the H. W. Johns Asbestos place? A. Yes, sir. Q. And get a load up there? A. No; he did not say what to get, or anything else. I go out to the factory, and I would stand there, and the shipping clerk would come out and tell me what to put on. Mr. Muldoon never told me anything at all. Q. Except to go to the factory? A. Just to go to the factory. Q. What time of the day was that? A. Six o'clock in the morning."

Again:

"Q. Where did you start from on the morning of February 17th,—Mr. Muldoon's place? A. I got the team over in Samuels' stable, and then he told me to go over and take one of Muldoon's trucks, and go up and go out to the factory. By the Court: Q. Who told you that? A. Mr. Samuels. Q. Did you see Mr. Muldoon that day? A. I seen him that morning. Q. What did Mr. Muldoon say to you? A. He told me to take that truck. Q. What else did he say to you? A. He didn't say nothing else,—only to go out to the factory to Johns. By Mr. Flannery: Q. You went to Samuels' and got the team? A. Yes, sir. Q. And attached the team to the truck and went to Johns'? A. Yes, sir. Q. You did not receive any directions where to go that day from Mr. Samuels? A. No, sir."

The defendant testified:

"Q. On this particular day, your horses being doubled up, you had need of an extra pair of horses to do the trucking for the asbestos company? A. Yes, sir. Q. For this reason you sent to Samuels, who had a peddling wagon, and got his horses. Is that true? A. I went to Samuels, or whatever you call him,

and I got a team of horses off him, and a driver. The Court: A team of horses with a driver? The witness: Yes, sir."

Again:

"Q. And Samuels only began a little while ago (that is, on the first day the snow fell) to do the asbestos company's trucking? A. Yes, sir. By the Court: Q. Did he do that under contract with you? Did you employ him to do it? A. No, sir; I didn't make no contract. I asked him to give me a team of horses and a driver, and I asked him what he wanted, and he told me $5 a day, and I paid him that."

The defendant was receiving $4.25 a day from the asbestos company for the trucking in question, and the jury apparently did not believe that he was not only paying a peddler $5 a day to do the work for him, but was also lending the peddler a truck for that purpose. In view of this discrepancy in the price, and of the fact that Samuels had no use whatever for a driver, except it might be for this trucking work; that Kraus was often hired by the defendant directly as an extra driver; that Kraus admitted to the policeman that he was working for the defendant on the occasion in question; that the work in progress was the defendant's work, and was being carried on under his directions; that the witnesses who attempted to shift the responsibility for the accident from the defendant were interested in the result, and their evidence is full of contradictions and inconsistencies,—the jury was justified in discarding the defense, and in concluding that the man who was driving the defendant's truck in fulfilling the defendant's contract was his employé.

The judgment and order should be affirmed, with costs.

WOODWARD, J., concurs. BARTLETT and JENKS, JJ., concur in result.

GOODRICH, P. J. I cannot concur in the prevailing opinion. I think that the motion for a nonsuit should have been granted. The complaint alleged that the plaintiff, while working on West street, New York City, was injured by a truck and team of horses which were "under the control and direction of a driver employed by the defendant." The pivotal question of the case was whether the defendant was the master, and the driver his servant. The truck was owned by the defendant, and the team by one Teriansky. The driver, Kraus, was in the employment of Teriansky, who paid his wages for the week during which the accident occurred. On the day of the accident, Teriansky directed Kraus to "take the team and go over to Mr. Muldoon's, and take Mr. Muldoon's truck and go out to the H. W. Johns Asbestos Company." Kraus went to Muldoon's and harnessed the team to the defendant's truck, and was told by him to take the truck and go to the asbestos factory. He went there and got a load, which the truck was carrying when the accident occurred. The evidence shows that, while Kraus was driving the team through a channel or passage in the digging of which the plaintiff was engaged, he "drew the rein" so that the wheels of the truck struck and injured the plaintiff. Mr. Justice HIRSCHBERG has stated all the evidence which, according to his opinion, required a

submission to the jury of the question whether or not Kraus was the employé of the defendant. I do not think the evidence thus stated by him was sufficient to justify the submission of this question. It is true that the defendant sent Kraus with the team to take the truck from the asbestos factory to its destination, but this was precisely what the driver and team were hired for. The defendant exercised no control over, and gave no instructions to, Kraus as to the route to be taken, or the method of driving, or any other detail of the work. Unless he did so, it cannot be said that Kraus was his employé, within the rules laid down in numerous authoritative decisions. How can it be said that Muldoon became liable for the negligence of Kraus in the performance of the independent contract of Muldoon with Kraus' employer? If Muldoon had interfered with the method of doing the work, or had directed some special method of driving, he would have made Kraus his subagent; and, if that method had caused an accident, a different question might have arisen. No such interference or direction appears. Muldoon's order was simply to do the trucking work for which the team and driver were hired. This did not make Kraus the subagent of the defendant as to the method of driving the team. It seems to me that it was error to deny the motion for a nonsuit, and that the judgment should be reversed.